UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARLENE FRIAS,
Plaintiff,

-v-

MELISSA AVILES-RAMOS, *et al.*,
Defendants.

25-CV-6613 (JPO)
SEALED
OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Marlene Frias filed this action on behalf of her child, A.F., against the New York City Department of Education (the "Department") and its Chancellor, Melissa Aviles-Ramos, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Article 89 of the New York State Education Law, N.Y. Educ. Law § 4401 *et seq*. She challenges a decision by a State Review Officer ("SRO") upholding a fifty-percent reduction in reimbursable costs for nursing services for A.F. for the 2024-2025 school year. (*See* ECF No. 5.) Defendants filed a counterclaim, seeking reversal of the SRO's rulings that the Department denied A.F. a free appropriate public education ("FAPE"), that Plaintiff's private placement was appropriate, and that Plaintiff was entitled to any reimbursement for 1:1 nursing services. (*See* ECF No. 17.) Both sides now move for summary judgment. (ECF Nos. 24, 30.) For the reasons that follow, Plaintiff's motion for summary judgment is denied, and Defendants' cross-motion is granted.

## I. Background

### A. Legal Framework

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education" and "that the rights of children with disabilities and

parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B). To provide a FAPE to each student with a disability, a school district is required to develop an Individualized Education Plan ("IEP") for each such child. 20 U.S.C. § 1414(d). The IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006) (quotation marks omitted); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining "IEP"). An IEP should be formulated in accordance with the procedures set forth in the IDEA and must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). An IEP, however, need not "furnish every special service necessary to maximize each handicapped child's potential." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (cleaned up). "New York law requires local Committees on Special Education ('CSEs') to develop IEPs for disabled children." *J.E. v. N.Y.C. Dep't of Educ.*, 229 F. Supp. 3d 223, 230-31 (S.D.N.Y. 2017).

A parent who believes that their child has been denied a FAPE under the IDEA "may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005) (quotation marks omitted); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii). "Parents seeking reimbursement under New York law must file a due process complaint challenging the appropriateness of the school district's recommendation." *J.E.*, 229 F. Supp. 3d at 231. A hearing on the complaint is then held before an Independent Hearing Officer ("IHO"). 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1). Either party may appeal the IHO's decision to the SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(1)-(2), and the SRO's final administrative decision may be challenged

by means of a civil action in state or federal court, 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a).

To obtain retroactive reimbursement, parents must satisfy the three-prong *Burlington-Carter* test, "which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014); *see also Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15-16 (1993); *Sch. Comm. Of Burlington v. Dep't of Educ.*, 471 U.S. 359, 367 (1985). "The first two prongs of the [*Burlington-Carter*] test generally constitute a binary inquiry that determines whether or not relief is warranted, while the third enables a court to determine the appropriate amount of reimbursement, if any." *A.P. v. N.Y.C. Dep't of Educ.*, No. 22-2636, 2024 WL 763386, at *2 (2d Cir. Feb. 26, 2024) (summary order).

**B. February 2024 IEP**

The following facts and procedural background are taken from the parties' submissions and the administrative record.

Plaintiff's child, A.F., is twelve years old and has been classified as a student with multiple disabilities. (ECF No. 28-1 at 37, 296; ECF No. 28-3 at 126.) A.F. has been diagnosed with Pierre Robin syndrome, cerebral palsy, dysphagia with jejunostomy dependency, chromosomal deletion syndrome, autism spectrum disorder, aphasia, myopic astigmatism, asthma, severe developmental delay, and precocious puberty. (ECF No. 28-1 at 268.) She is non-verbal, non-ambulatory, and requires assistance with all activities of daily living. (*Id*. at 145.) A.F. does not consume any food or drink orally and is fed and hydrated via gastrojejunostomy-tube feedings. (*Id*. at 257.)

A Committee on Special Education ("CSE") convened on February 27, 2024 to develop an IEP for A.F. (*Id*. at 10-11.) On the evening before the meeting, the International Institute for the Brain ("iBrain"), where A.F. was attending school, submitted a request to add a 1:1 nurse (in addition to A.F.'s 1:1 paraprofessional) on the sole basis of ensuring that A.F. did not pull out her feeding tube while at school. (ECF No. 28-4 at 3, 5.) Around noon the following day, the CSE contacted Dr. Connie Kostacos, A.F.'s physician, to seek her opinion on the request for a 1:1 nurse, and left a message. (*Id.* at 2.) At the IEP meeting, the district school psychologist, Dorothy Pfeiffer, stated that the CSE was, "[a]t this time, . . . not able to recommend nursing services," and that A.F.'s medical forms had been sent to the district's nursing unit for review. (ECF No. 28-3 at 251-52.) Pfeiffer noted that they "did submit the medical forms" that iBrain had sent, and that "[a]s soon as the nursing unit reviews them," the CSE would "reach out to let [them] know the recommended nursing services." (*Id.* at 252.) The CSE ultimately recommended, among other services, a 12:1+(3:1) special class placement for A.F., a 1:1 health paraprofessional while at school and during transportation to and from school, and individual school nurse services on an "as needed" basis for the 2024-25 extended school year. (ECF No. 28-1 at 11; ECF No. 28-2 at 135.)

On March 1, 2024, Dr. Kostacos informed the CSE of her opinion that "1:1 nursing is not recommended while [A.F.] is at school" and that a sufficient arrangement was a 1:1 health paraprofessional with a school nurse available if the feeding tube became dislodged. (ECF No. 28-3 at 126.) On March 4, 2024, the district registered nurse, Marylou O'Rourke, emailed the letter to Department staff, asked that the letter be uploaded to the relevant database, and requested that, "if in agreement, [they] change [t]he recommendation to non 1:1 skilled nursing

services." (ECF No. 28-4 at 1.) No follow-up meeting took place after the Department's receipt of Dr. Kostacos's letter. (ECF No. 28-1 at 21.)

On June 14, 2024, Plaintiff sent a letter to the Department expressing her disagreements with A.F.'s February 2024 IEP and notifying the Department that she intended to place A.F. at iBrain. (ECF No. 28-1 at 11, 138-39.) Shortly thereafter, Plaintiff executed a contract to enroll A.F. at iBrain for the 2024-25 extended school year for $311,838.40. (*Id*. at 159-64.) Plaintiff also entered into an agreement with B&H Health Care Services, Inc. ("B&H") for the provision of 1:1 nursing services during both school and A.F.'s transportation to and from school for $333,608. (*Id*. at 11, 173-80.) Finally, Plaintiff entered into a contract with Sisters Travel and Transportation Services ("Sisters") to transport A.F. to and from iBrain for $220,993. (*Id*. at 11, 166-72.)

### C. Administrative Proceedings

On July 2, 2024, Plaintiff filed a due process complaint with the Department requesting a full award of tuition to iBrain and related services for A.F. (*Id*. at 11-12.) The IHO issued its Findings of Fact and Decision ("FOFD") on November 1, 2024, which concluded that the Department failed to offer A.F. a FAPE for the 2024-25 school year and that iBrain was an appropriate placement for A.F. (*Id*. at 13, 42-57.) The IHO found, however, that Plaintiff had not established that Sisters' transportation services sufficiently met A.F.'s needs, and therefore declined to award funding for it. (*Id*. at 13, 52-53.) Instead, the IHO ordered the district to provide A.F. with transportation to and from iBrain for the school year. (*Id*. at 57.) The IHO also found that the nursing services award should be reduced by half under the third prong of the *Burlington-Carter* test because of Plaintiff's "misconduct regarding the resolution process" and to ensure that none of the funds were used for a 1:1 nurse during A.F.'s transport to and from school. (*Id*. at 13, 55.)

Plaintiff appealed the IHO's FOFD to the SRO, arguing that the IHO erred by reducing the award for 1:1 nursing services by half and denying payment for Sisters' transportation services. (*Id*. at 14). The Department cross-appealed. (*Id.*) The SRO's April 8, 2025 decision upheld the IHO's finding that the Department had failed to offer A.F. a FAPE and the IHO's fifty percent reduction of the 1:1 nursing services award, but reversed the IHO's denial of funding for Sisters' transportation services and its order requiring the Department to provide transportation. (*Id*. at 28-29.) Despite earlier affirming the IHO's fifty-percent reduction of the 1:1 nursing services award, the SRO later directed the Department to pay, without qualification, "for the cost of the student's in-school nurse for the 2024-25 school year." (ECF No. 31 at 17; ECF No. 28-1 at 29.)

**D. Procedural History**

On August 12, 2025, Plaintiff filed this action challenging the SRO's fifty-percent reduction of the award for A.F.'s 1:1 nursing services. (ECF No. 5 at 14-15.) On November 19, 2025, the Department filed an answer and counterclaim seeking reversal of the SRO's determination that the Department failed to provide a FAPE, reversal of its order that the Department make full payment to Sisters' transportation services and B&H, and clarity on the discrepancy between the SRO's decision and order regarding funding for A.F.'s 1:1 nursing services. (ECF No. 17 at 19-20; ECF No. 31 at 17-18.) On February 11, 2026, Plaintiff filed an answer to Defendants' counterclaim (ECF No. 26) and moved for summary judgment (ECF No. 24), with an accompanying memorandum of law (ECF No. 25). On March 13, 2026, Defendants opposed Plaintiff's motion and filed a cross-motion for summary judgment (ECF No. 30), also with an accompanying memorandum of law (ECF No. 31). Plaintiff opposed the cross-motion and filed a reply in further support if its motion on April 3, 2026. (ECF No. 34.) Defendants filed a reply in further support of their cross-motion on April 24, 2026. (ECF No. 35.)

## II. Legal Standard

In an IDEA action, summary judgment motions are treated as, "in substance[,] an appeal from an administrative determination." *M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012). The district court receives records of the state administrative proceedings and may hear additional evidence if requested by either party. 20 U.S.C. § 1415(i)(2)(C)(i)-(ii). "[B]asing its decision on the preponderance of the evidence," the district court "shall grant such relief as [it] determines is appropriate." *Id.* § 1415(i)(2)(C)(iii); *T.M.*, 752 F.3d at 152.

In reviewing IDEA administrative determinations, district courts "must give due weight to [the state administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.H.*, 685 F.3d at 240 (alterations and quotation marks omitted). "[C]ourts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). However, regarding "issues of law, such as the proper interpretation of the federal statute and its requirements," courts owe no deference to administrative decisions. *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005) (cleaned up).

## III. Discussion

### A. Prong 1: Provision of a FAPE

Defendants argue that the SRO erred by concluding that the Department failed to provide A.F. with a FAPE under the first prong of the *Burlington-Carter* test. Specifically, Defendants contend that (1) the IHO correctly upheld the CSE's decision not to recommend 1:1 nursing services (ECF No. 31 at 19), and (2) the Department's recommended classroom size was sufficient to satisfy the IDEA (*id.* at 22). The Court takes each argument in turn.

**1. Nursing Services**

The IHO—relying on Dr. Kostacos's March 1, 2024 letter—concluded that "the CSE had a well-grounded reason for not recommending full-time 1:1 nursing for [A.F.]." (ECF No. 28-1 at 48; *see also* ECF No. 28-3 at 126; ECF No. 28-4 at 1). The SRO reversed this determination on several grounds. First, the SRO observed that the CSE's refusal to recommend 1:1 nursing services for A.F. at the February 27, 2024 meeting could not have been based on Dr. Kostacos's March 1, 2024 letter, which post-dated the meeting. (*See id.* at 21.) Second, the SRO noted that the February 2024 IEP itself, which was the basis for the CSE's recommendations, repeatedly recognized the need for 1:1 nursing services for A.F. (*Id.* at 20.) Third, the SRO found that the CSE's recommendation that A.F. receive nursing services "as needed" contravened state guidance on 1:1 nursing services. (*See id.* at 21-22.) This guidance instructs that, as to the provision of nursing services to a student, "the term 'as needed' is not specific enough to provide a clear frequency and/or duration for this service and may result in inconsistent implementation." (*Id.* at 22 (quoting "Guidelines for Determining a Student with a Disability's Need for a One-to-One Nurse," Office of Special Educ. Mem. (Jan. 2019), https://www.nysed.gov/sites/default/files/programs/special-education/guidelines-for-determining-a-student-with-a-disability-need-for-a-1-1-nurse.pdf.)

The SRO's findings are supported by the preponderance of the evidence. There is no dispute that Dr. Kostacos's letter post-dated the IEP meeting held by the Department. It is therefore unclear on what basis the CSE denied 1:1 nursing services at the meeting, particularly since the February 2024 IEP, on which the CSE relied to formulate its recommendations, contained multiple suggestions to the contrary. The February 2024 IEP stated, for example, that A.F. required a "1:1 nurse to support her medical, physical, cognitive, and sensory needs throughout the day," and "to administer emergency medications, [and] aid in safety." (ECF No.

28-2 at 13; *see also* ECF No. 28-1 at 302 ("[A.F.'s] 1:1 nurse provides constant supervision of her G-tube throughout all sessions."); ECF No. 28-2 at 7 ("[A.F.] requires maximal support from her paraprofessional and 1:1 nurse[.]"); *id.* at 13 ("[A.F.'s] 1:1 paraprofessional and nurse [are] essential to engage and encourage [her] attention, safety, and nursing needs in the physical therapy session."); *id.* at 15 ("[A.F.'s] 1:1 nurse and 1:1 paraprofessional provide intense and continuous monitoring of all potentially unsafe behaviors regardless of reason so as to provide as safe of an environment for [A.F.] at all times.").) Indeed, the IHO acknowledged in his FOFD that the physician's recommendation, on which he relied to affirm the CSE's decision not to provide 1:1 nursing services, was "somewhat in contrast to the observations of [A.F.'s] performance listed in the IEP." (ECF No. 28-1 at 48.)

Additionally, even if the Court construes the later-received physician's letter as retroactively ratifying the CSE's recommendations as to 1:1 nursing services, the Department makes no effort in its briefing to address the SRO's concern that "the district's recommendation of nursing services 'as needed' did not align with the present levels of performance in the February 2024 IEP indicating the student required 1:1 nursing; and further, did not align with State guidance." (*Id.* at 22.) The Department argues incorrectly that the SRO's reversal of the IHO "boils down to a single ground": that the Department failed to reconvene an IEP meeting after receipt of Dr. Kostacos's letter. (ECF No. 31 at 20.) But this procedural kink was not the focus of the SRO's analysis. And on this record, absent explanation as to whether the CSE's "as needed" recommendation complies with State guidance and why a post hoc physician's letter outweighs the many indications in the February 2024 IEP that a 1:1 nurse is critical for A.F.'s

care, the Court sees no basis for disturbing the SRO's reasoning.[1] *See R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) ("[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned[.]").

**2. Classroom Size**

Next, Defendants contend that the IHO[2] erred by concluding that a 12:1+(3:1) classroom size—which refers to a classroom with a maximum of twelve students, one special education teacher, and one paraprofessional for every three students—was not sufficient to provide A.F. with a FAPE. (ECF No. 31 at 22.) The Department relies in the main on *Navarro Carrillo v. New York City Department of Education*, No. 21-2639, 2023 WL 3162127 (2d Cir. May 1, 2023) (summary order). (*Id.* at 23-24.) There, the Second Circuit described a 12:1:4 classroom as "the most supportive classroom environment contemplated by the applicable New York regulations," and held that the student's placement in a 12:1:4 classroom did not violate the IDEA because "[t]he CSE met its obligation to carefully consider the student's needs, and developed a plan that would provide her with a FAPE." *Id.* at *1, *3.

Nothing in *Carrillo*, however, undermines the IHO's findings. The IHO's concern, as laid out in his FOFD, was not that the CSE's classroom size recommendation was insufficiently

---

[1] Separately, Defendants argue that Plaintiff waived the argument that the Department denied A.F. a FAPE by failing to recommend 1:1 nursing services because she raised it only in her reply before the SRO. (ECF No. 31 at 21-22; ECF No. 35 at 6-7.) But the Department, in its cross-appeal of the IHO decision, asked the SRO to "affirm in-part the [IHO's FOFD] relative to limiting nursing relief." (ECF No. 28-1 at 116.) Though Plaintiff certainly could have presented the issue more squarely before the SRO, the Department's cross-appeal put the 1:1 nursing recommendation sufficiently at issue to preclude waiver.

[2] Because the SRO concluded that the Department had denied A.F. a FAPE based on its recommendation as to 1:1 nursing services, the SRO declined to address whether the class size recommendation was also inadequate. (*See* ECF No. 28-1 at 22 n.13.)

supportive of A.F., but that the CSE "failed to provide any justification to explain its placement recommendation either in the IEP itself or at the hearing." (ECF No. 28-1 at 41.) As the IHO observed, the Department recommended a 12:1:4 classroom size even though it "relied, entirely, on assessments and progress reports done by [iBrain] in developing Student's 2/27/2024 IEP" that were "consistent on the point that Student requires, at most, an 8:1:1 classroom to make academic progress." (*Id.*) The IHO also found the testimony of school psychologist Dorothy Pfeiffer "entirely conclusory," since Pfeiffer "fail[ed] to explain why the CSE recommended classroom size is so different than what is recommended in all the evaluative material that the [Department] relied upon in generating the IEP." (*Id.* at 41-42.)

The IHO's findings are supported by the record. Pfeiffer testified that the district recommended a 12:1+(3:1) classroom size "based on the progress reports and iBrain IEP[3] provided to the CSE prior to the IEP meeting." (ECF No. 28-3 at 455.) But the iBrain IEP, as well as other supporting materials, consistently recommend an 8:1:1 classroom size for A.F. (*See, e.g.*, ECF No. 28-3 at 84 ("An 8:1:1 ratio classroom would be most beneficial to support [A.F.] and her communication skills."); *id.* at 385 (same); ECF No. 28-2 at 117 (same); ECF No. 28-3 at 120 (same); ECF No. 28-5 at 384 (testimony by Deputy Director of Special Education at iBrain that A.F. "does need a classroom in an 8:1:1 setting with limited distraction").) The Department does not explain this discrepancy. And contra *Carrillo*, this incongruity casts doubt on whether the CSE "met its obligation to carefully consider the [A.F.'s] needs" and in fact prescribed an individualized classroom size recommendation. *Carrillo*, 2023 WL 3162127, at *3.

---

[3] The IHO clarifies that the iBrain IEP referenced in Pfeiffer's testimony is the "iBrain Report and Education Plan" at ECF No. 28-3 at 55-124. (*See* ECF No. 28-1 at 41 n.7.)

In such cases, "the Court must defer to the IHO[]'s findings, which were grounded in credibility determinations made by the IHO after hearing the relevant testimony." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 255 (2d Cir. 2012). Because the IHO's determination—namely, that the Department's classroom size recommendation denied A.F. a FAPE—is supported by a preponderance of the evidence, the Court affirms it.

**B. Prong 2: The Appropriateness of Private Placement**

Under prong two of the *Burlington-Carter* test, the Court must determine whether "the private education services obtained by the parents were appropriate to the child's needs." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). To qualify for reimbursement under the IDEA, parents "need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." (*Id.* (quotation marks omitted).)

**1. Sisters Travel and Transportation Services**

According to the February 2024 IEP, A.F. requires several specialized services as part of her transportation to and from school, including a 1:1 travel paraprofessional and curbside transportation. (ECF No. 28-2 at 41.) The IHO, however, concluded that Plaintiff had "entirely failed to meet [her] burden in establishing that [Sisters] offered transportation services sufficient

to meet [A.F.'s] needs" because "[n]o evidence was introduced at the hearing regarding what [Sisters] offers [A.F.] during the 2024-2025 school year." (ECF No. 28-1 at 52.) The SRO reversed this determination, relying solely on the contract between Plaintiff and Sisters and Plaintiff's testimony that she communicated regularly with Sisters and that Sisters typically picked up A.F. between 7:45 and 8 a.m. each school day as evidence that "Sisters provided the student with appropriate special transportation services." (*Id.* at 26; *see also* ECF No. 28-5 at 448-49.)

The SRO's conclusion that Sisters is an appropriate placement, however, is not supported by the preponderance of the evidence. Under the IDEA, a private placement is appropriate for a disabled child if it is "reasonably calculated to enable the child to receive educational benefits." *Frank G.*, 459 F.3d at 364 (quotation marks omitted). In determining whether a private placement is "reasonably calculated" to support a student's progress, courts typically consider evidence of the student's progress and testimony about the type of support the student is receiving. *See, e.g.*, *id.* at 364-66 (considering testimony from teachers about the student's learning environment and the student's test scores to conclude that a placement was appropriate); *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 513-14 (S.D.N.Y. 2013) (considering testimony, past progress reports, and the school's implemented food safety rules to conclude that a placement was appropriate); *Mr. & Mrs. A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 418-19 (S.D.N.Y. 2011) (considering "detailed and consistent testimony" about the student's progress, specific program offerings, and test scores to conclude that a placement was appropriate).

The evidentiary record before the Court, however, falls far short of this norm. Plaintiff points to no records, no reports, and no testimony that speak to the actual services provided by

Sisters to A.F. Neither the contract between Plaintiff and Sisters, which does not mention the provision of a 1:1 paraprofessional or curbside transportation (*see* ECF No. 28-1 at 214-19), nor Plaintiff's limited testimony supplies any detail about whether and what specialized services were in fact provided to A.F. during her transport to and from school, let alone whether those measures were "reasonably calculated" to support her progress. This dearth of evidence is, in large part, Sisters' own doing: Sisters wholly failed to respond to the Department's subpoena request for records. (*Id.* at 52-53.) On this thin record, Plaintiff has not demonstrated that she is entitled to reimbursement for Sisters' services.

Plaintiff relies on *B.R. ex rel. K.O. v. New York City Department of Education*, 910 F. Supp. 2d 670, 677 (S.D.N.Y. 2012), to argue that "the appropriateness of a unilateral placement is whether the program reasonably could have been expected to offer a student meaningful educational benefit *at the time of placement*." (ECF No. 34 at 15.) But *B.R.* applies the Second Circuit's uncontroversial holding that the Department may not use "retrospective testimony," *B.R.*, 910 F. Supp. 2d at 676-77 (citing *R.E.*, 694 F.3d at 186)—or "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement," *R.E.*, 694 F.3d at 185—at an IHO hearing to cure deficiencies in an IEP. *B.R.* hardly establishes a blanket rule that, in assessing the appropriateness of a private placement, courts are precluded from considering whether that private placement has in fact been delivering the services it said it would. To the contrary, the Second Circuit has held that "a unilateral placement was inappropriate 'when the record [did] not contain specific evidence of what services were actually provided to the student to address the disability that the private placement [was] intended to ameliorate.'" *Khanimova v. Samuels*, No. 25-1396, 2026 WL 1730666, at *2 (2d Cir. June 15, 2026) (summary order) (quoting *Hardison v.*

*Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 388 (2d Cir. 2014)); *cf. Stevens ex rel. E.L. v. N.Y.C. Dep't of Educ.*, No. 09-CV-5327, 2010 WL 1005165, at *9 (S.D.N.Y. Mar. 18, 2010) (concluding that private placement was not appropriate because the evidentiary record lacked, among other things, "any objective data that would provide benchmarks for measuring the [s]tudent's progress"). Such is the case here.

Because Plaintiff has not proven by a preponderance of the evidence that Sisters is an appropriate placement for A.F., the SRO's award of funding to Sisters is reversed.

**2. Nursing Services with B&H**

The Department argues that Plaintiff has similarly failed to demonstrate that B&H's 1:1 nursing services are appropriate for A.F. (ECF No. 31 at 27.) In his FOFD, the IHO questioned why a separate entity, rather than iBrain itself, was tasked with providing 1:1 nursing services, and noted that—because B&H, too, "refused to provide any information in response to a subpoena"—the record contains no information about the identity or qualifications of A.F.'s 1:1 nurse. (ECF No. 28-1 at 52.) Nonetheless, the IHO determined that Plaintiff's contract with B&H "indicates that [A.F.'s] 1:1 nurse will be properly qualified, and the expectations of the nurse are clear based on [iBrain's] Education Plan." (*Id.*) The IHO therefore accepted that B&H was "offering [A.F.] with necessary nursing services to make academic progress." (*Id.*) The SRO upheld the IHO's decision. Relying solely on the contract between B&H and Plaintiff, which states that B&H "shall provide a 1:1 Private Duty Nurse for [A.F.] during the school hours" (*id.* at 222 (emphases omitted)), and the iBrain educational plan, which outlines the specific duties of A.F.'s 1:1 nurse (*see* ECF No. 28-3 at 95-102), the SRO concluded that "the hearing record supports the IHO's findings that the nursing services provided to the student during the 2024-25 school year were appropriate." (ECF No. 28-1 at 24.)

For substantially the same reasons as above, the IHO and SRO erred in concluding that B&H is an appropriate placement for A.F. Aside from the contract between B&H and Plaintiff and iBrain's educational plan, Plaintiff has marshaled no evidence about the actual provision of 1:1 nursing services by B&H. She has provided no information about the name or qualifications of A.F.'s 1:1 nurse and supplied no records or testimony regarding the 1:1 nurse's interactions with A.F. On this record, the Court has virtually no basis from which to assess whether B&H's services are "reasonably calculated to enable [A.F.] to receive educational benefits." *Frank G.*, 459 F.3d at 364 (quotation marks omitted).

Plaintiff retorts that the Department is asking the Court to "improperly evaluate the appropriateness of the services retrospectively rather than prospectively as required by the IDEA and precedent," presumably referring again to *B.R. ex rel. K.O. v. New York City Department of Education*, 910 F. Supp. 2d 670, 677 (S.D.N.Y. 2012). (ECF No. 34 at 17.) But, as discussed above, *B.R.* does not bar the Court from requiring some evidence that a nursing provider is in fact delivering its contracted-for services in compliance with the IDEA. A contrary rule—that the appropriateness of a placement may be determined based on the promises of a contract alone—would enervate the second prong of the *Burlington-Carter* test and permit liberal reimbursements to any private facility that can produce a written contract, regardless of what services it was in fact providing (or not providing) to the student over the course of the school year. Plaintiff's argument is also at odds with the plethora of court opinions in IDEA cases that rely on grades, reports, testimony, and other extrinsic evidence to assess the appropriateness of a private placement. *See, e.g.*, *Frank G.*, 459 F.3d at 364-66; *D.C. ex rel. E.B.*, 950 F. Supp. 2d at 513-14; *Mr. & Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 418-19; *Stevens ex rel. E.L.*, 2010 WL 1005165, at *9.

Nor does the requirement that Plaintiff produce some modicum of evidence of the provision and quality of B&H's 1:1 nursing services mean that "a parent will never be entitled to reimbursement under the IDEA until after the student has completed the entire school year," as Plaintiff contends. (ECF No. 34 at 18.) There is no reason that a parent cannot adduce evidence of a student's contemporaneous learning environment as that student progresses through the school year for the purpose of seeking reimbursement from the state, and indeed, parents routinely produce such evidence in other IDEA cases. *See, e.g.*, *Thomason v. N.Y.C. Dep't of Educ.*, No. 23-CV-8654, 2025 WL 307223, at *4 (S.D.N.Y. Jan. 27, 2025) ("The Parents presented sufficient affidavit testimony and submitted substantial documentary evidence in support of their position that the [private] placement . . . was appropriate." (cleaned up)), *aff'd sub nom. Thomason v. Banks*, No. 25-475, 2026 WL 201127 (2d Cir. Jan. 27, 2026); *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, No. 06-CV-4238, 2007 WL 1259145, at *6 (S.D.N.Y. Apr. 27, 2007) (concluding that a private placement was appropriate in light of testimony from the parents and instructors as to the student's progress in the school).

Because Plaintiff has failed to prove by a preponderance of the evidence that B&H is an appropriate placement for A.F., the SRO's award of funding to B&H is reversed. Accordingly, the Court need not evaluate the equities under the third prong of the *Burlington-Carter* test. *Cf. K.S. v. N.Y.C. Dep't of Educ.*, No. 11-CV-7443, 2012 WL 4017795, at *10 (S.D.N.Y. Aug. 8, 2012) (declining to reach the third prong of the *Burlington-Carter* test after concluding that Plaintiffs failed to demonstrate that the private placement was appropriate).[4]

---

[4] Since no reimbursement for 1:1 nursing services is warranted under the second prong of the *Burlington-Carter* test, the Court also need not clarify the discrepancy in the SRO's order as to funding for 1:1 nursing services. (ECF No. 31 at 33.)

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and Defendants' cross-motion for summary judgment is GRANTED.

The Clerk of Court is directed to enter judgment in favor of Defendants, to terminate the motions at Docket Numbers 24 and 30, and to close this case.

Because this opinion and order contains confidential and personally identifiable details about A.F., who is a minor, the Clerk of Court is directed to file this unredacted version under seal. The parties are directed to confer and submit jointly proposed redactions to this opinion and order within fourteen days of the date of this Order.

SO ORDERED.

Dated: August 17, 2026
New York, New York

J. PAUL OETKEN
United States District Judge